Drake, Ch. J.,
delivered the opinion of the court:
In the spring of 1864 the claimant was a resident of the city of Memphis, Tennessee, which city was then in the military occupation of the United States. He claimed tb be the owner of certain slaves which were at Mobile, Alabama, and. he gave to Christian Dickmann, a subject of Denmark, a power of attorney to sell the said slaves and invest the proceeds in cotton, real estate, or anything Dickmann pleased. Mobile was then within the territory occupied by the rebel Confederacy. Dickmann passed through the military lines of the United States under a passport of the provost marshal at Memphis, *285 and, prior to April, 1864, arrived at Mobile, where he sold the negroes, which the claimant assumed to own as slaves, for $200,000 in Confederate money, with which he bought cotton, turpentine, and rosin. Seventy-seven bales of the cotton so bought were captured by the military forces of the United States upon the occupation of Mobile by them, and sold, and the proceeds paid into the Treasury of the United States, for which the claimant brings this suit.
It seems to us.'that this case is essentially undistinguishable from Grossmeyer’s Case, (9 Wall., 72,) except that the claimant here is less entitled to recover than was the claimant in that case.
There the claimant, a resident of New Tork, was, when the war of the rebellion broke out, a creditor of one Einstein, a resident of Macon, Georgia; and while the war was in progress, a correspondence on the subject of the indebtedness of the latter was kept up, through the medium of a third person, who chanced to pass back and forth between Macon and New Tork. The communication between the parties resulted in Grossmeyer requesting Einstein to remit the amount due him in money or sterling exchange, or, if that were not possible, to invest the sum in cotton and hold it for him until the close of the war. Einstein purchased cotton for Grossmeyrer, and informed him of it, Grossmeyer expressing himself satisfied with the arrangement. The cotton was captured by the military forces of the United States at Savannah, and sent to New Tork and sold. Grossmeyer preferred a claim for the net proceeds in this court, and when the case went to the Supreme Court it was there held that he was prohibited during the war from having any dealings with his agent; that nothing which both or either of them did could have the effect to vest in Gross-meyer the title to the cotton; and that not being, therefore, the owner of the cotton, he had no claim against the United States.
Now, what is the difference, in substance, between that case and this? If there is any, it is against this claimant.
Here the claimant’s agent was not his debtor trying to pay his debt, but one appointed for a specific purpose.
Nor was the agent a resident of the insurrectionary States, with whom the claimant communicated by letter, but a resident of the territory occupied by the military forces of the United *286 States, receiving within the lines of those forces apower of attorney from the claimant to sell negroes which were in Mobile, Alabama, and to execute his agency, passing through those lines, under a passport granted by the provost marshal of the Union forces, without knowledge of the specific purpose he had in view. •
He went, too, with authority to sell as slaves persons who, more than a year before, had been declared free by proclamation of the President of the United States, and to invest the proceeds in other property.
The whole transaction, therefore, was, in any point of view, much less meritorious than that between G-rossmeyer and Einstein.
It is, however, attempted to distinguish this case from that, upon the ground that Grossmeyer was resident in a loyal State, while the claimant in this case was resident in a State which had, by presidential proclamation, been declared in insurrection, and therefore constituted a part of the insurrec-tionary region within which it is claimed parties might lawfully hold commercial intercourse with each other. This distinction is not sound.
The proclamation of the President of August 16, 1861, declaring the people of certain States and parts of States in insurrection, excepted from its operations such parts of any of such.States as might “be, from time to time, occupied and controlled by forces of the United States engaged in the dispersion of said insurgents.” Among the States named in that proclamation was Tennessee.
On the 6th .of June, 1862, the city of Memphis was captured, and thenceforth was occupied and controlled by forces of the United States, and thereby came within the exception of that proclamation.
On the 2d of April, 1863, however, the President issued another proclamation, revoking that exception, and declaring the inhabitants of Tennessee, as well as those of the other rebel States, to be in a state of insurrection; and that all commercial intercourse not licensed and conducted as provided in the Act 13th July, 1861, between the said States and the inhabitants thereof, (with certain defined exceptions,) and the citizens of other States and other parts of the United States, was unlawful, and would remain unlawful until the insurrection should cease or be suppressed.
*287 It is urged that the effect of this proclamation was to make Memphis, though then occupied by Union forces, a part of the insurrectionary region, in such sense as to authorize commercial intercourse between its inhabitants and those of Alabama; or, in other words, that the mere fact of its being within the limits of a State declared in insurrection authorized such intercourse, regardless of the fact that it was within the military lines of those forces.
This position cannot, in our judgment, be maintained. Whatever might be said in support of the right of commercial intercourse between inhabitants of portions of Tennessee which were not Avithin the lines of the military forces of the United States and inhabitants of Alabama Avithin the enemy’s lines* there is no principle of law which would alloAv such intercourse between persons residing within the former lines and persons, residing in the region controlled and held by the enemy.
The act of the claimant in holding such intercourse is not,, as we understand, defended upon legal principles, but upon the simple ground that, technically, Memphis was in a State which had, as a whole, been declared in insurrection, though at that spot the insurrection was practically subdued through its occupation by the military forces of the government.
If the illegality of commercial intercourse between the inhabitants of Memphis and those of Mobile rested upon that proclamation alone, this position would be more plausible; but it had. a much broader foundation in the well-established rule of public law, announced by the Supreme Court in Grossmeyer’s case in these words:
“It has been found necessary, as soon as Avar is commenced, that business intercourse should cease between the citizens of the respective parties engaged in it, and this necessity is so great that all writers on public law agree that it is unlawful, loithout any express declaration of the sovereign on the subject.”
This rule is decisive. The claimant was a citizen of the United States, residing within lines of, and protected by, the military forces- thereof, and his sending an agent through thosé lines to trade with inhabitants of the rebel confederacy was unlawful “business intercourse ” Avith them, and gave him no rights which he can enforce here against the government whose laws he disregarded.
If it be asked what, then, was the object and intent of the- *288 proclamation of April 2, 1863, we answer, that it seems to us to have been simply to define the territorial limits of the insurrection, and to notify the people who adhere to the government' that commercial intercourse with the insurgent people residing within those limits was unlawful.
Had the war been with a' foreign nation, there would have been no difficulty in all knowing that commercial intercourse with that nation was ■ suspended, and in knowing, too, the boundary line between us and that nation; but in an internal war, where the parties were of the same nation, and States were ■divided by imaginary lines, an official definition of the boundaries of the insurrection was indispensable. This was made in the proclamation, and was, we suppose, its principal object and intent.
Whether so or not, however, we have no difficulty in holding that, upon the principle of public law stated by the Supreme Court, the acts of the claimant and his agent were unlawful, and therefore no title to the cotton in question was by those acts vested in the claimant.
The claimant’s petition is therefore dismissed.